**In re W.S. SHEPPLEY & CO., Debtor.**

**Bankruptcy No. 84–01160.**

United States Bankruptcy Court,
N.D. Iowa.

May 30, 1986.

See also, Bkrtcy., 64 B.R. 134.

L.F. Burnette, II, Nyemaster, Goode & McLaughlin, Des Moines, Iowa, for creditor.

Ronald Peterson, Jenner & Block, Chicago, Ill., Alfred Hughes, Hughes & Trannel, Gary Norby, O'Connor & Thomas, Dubuque, Iowa, for debtor.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge, sitting by designation.

This case is before the court upon the "Application for Determination of Secured Claim of Metropolitan Life Insurance Company Pursuant to 11 U.S.C. § 506" filed by the first mortgagee lienholder on February 11, 1986. The lien in question is admittedly valid and covers the Chapter 11 debtor's principal asset, i.e., a major office building located in Dubuque, Iowa.

The only issue in dispute is whether in determining the "allowed secured claim" of Metropolitan under § 506(b) of the Bankruptcy Code the court must apply and allow a contractual "default" rate of interest of 12 percent, or whether the lower "pre-default" rate of 9.27 percent may be used for this purpose.[1] By stipulation of the parties at hearings on February 28, 1986 and May 19, 1986, the resolution of this issue in effect will determine whether the allowed secured claim, as of May 1, 1986, will be $4,303,333.75, at the higher rate, or $4,057,658.74, at the lower rate. Per diem interest thereafter is running in the amount of $1,045.62 at the higher rate, and $796.67 at the lower rate.

This $245,675.01 differential as of May 1, 1986 will increase, due to the differing per diem rates, as time passes until a plan of reorganization can be confirmed and implemented. The differential will be crucial to the question of what distribution may be possible to a junior lienholder and the unsecured creditors in this estate. Under the pending plan, as amended January 21, 1986, the building will be put up for sale in an orderly liquidation to be sold by a broker by July 1, 1987. The junior lienholder, having a claim in excess of $3.0 million, and the unsecured creditors would share 60 percent and 40 percent, respectively, in any surplus remaining after Metropolitan Life Insurance Company is paid off in full.[2]

This court found in 1984, in conjunction with an adequate protection hearing, that the value of the building in November of 1984 was $5.2 million. *In re Sheppley & Co.*, 45 B.R. 473 (N.D. Iowa 1984). No new evidence of value was presented to me but the record in this case indicates Metropolitan Life Insurance Company has introduced evidence showing a value between $5.2 and $5.7 million, while the debtor con-

---

1. The debtor does not concede that this lower basic rate in the contract is *required* to be applied under § 506(b) but agrees that such rate is appropriate for allowance on the facts of this case.

2. While the plan also provides for a *possible* further distribution to shareholders, that factor is not material in my decision for reasons set forth below.

tends the value is between $7.0 and $8.0 million.

Whatever the value may turn out to be in a negotiated sale under the pending plan, if that plan is accepted and confirmed by the court, it is clear that Metropolitan Life Insurance Company was assured payment of its mortgage debt in full from the collateral at the time this case was filed in September 1984; is assured of payment in full at the present time; and will be assured payment in full by the contemplated outside liquidation date of July 1, 1987.

## THE PRIOR RULING

Metropolitan argues that Judge Thinnes' 1984 ruling in this case, *In re Sheppley & Co.*, supra, supports its position that the default rate should apply in determining the total amount of its secured claim. However, it is clear that Judge Thinnes' citation and discussion of cases in that opinion, with regard to default rates, has to be tempered by his final conclusion:

> Although the default rate of interest provided for in the note by agreement of the parties is the appropriate rate of interest to be applied in this instance, this Court expressly limits this holding to litigation analyzing the concept of adequate protection. The Court expressly declines to hold that the default rate of interest found to be applicable for purposes of the stay litigation herein is the appropriate rate of interest to be applied in the event that the Debtor-in-Possession seeks to cure the defaults pursuant to 11 U.S.C. § 1124(2).

Moreover, the issue before me is strictly limited to allowance of a secured claim under § 506(b) of the Code. The plan has not yet been sent to creditors and in its present form at least it does not propose a § 1124(2) "cure" in the sense contemplated by that provision. Accordingly, the earlier decision in this case by Judge Thinnes has no relevance, one way or the other, on the § 506(b) issue before this court.

## THE "MONNIER" DECISION

Both the debtor and Metropolitan Life Insurance Company cite the decision in *In re Monnier Bros.*, 755 F.2d 1336 (8th Cir. 1985), in support of their conflicting positions. Again, however, I find the cited decision of no relevance to the § 506(b) issue before me.

The sole issue disputed and raised on appeal in the *Monnier* case had to do with setting an appropriate discount rate *for plan purposes* under § 1129 of the Code. The issue involved the appropriate rate for deferred repayment of the secured debt, over 15 years under that plan, pursuant to § 1129(b)(2)(A)(i)(II).

The court of appeals rejected the contention of the secured creditor that *as a matter of law* the basic contract rate had to be applied when prevailing interest rates were lower at the time of confirmation. However, in the absence of any other *evidence* of an appropriate rate the Court in *Monnier* did affirm the use of the contract rate on a relatively recent secured transaction. *Monnier*, supra, at pp. 1338–39.

The parties in the *Monnier* case had *agreed* in the courts below that the contract default rate could be applied in determining the pre-confirmation amount of the secured debt. No legal issue regarding that matter was raised in the court of appeals and therefore the mere *recitation* of that fact by court in its opinion does not constitute a *ruling* that such interest is allowable. The § 506(b) question simply was not presented for decision in the *Monnier* case.

## THE STATUTORY QUESTION

As both parties recognize, the language of § 506(b) can be read in two different ways. The statute provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for un-

der the agreement under which such claim arose.

The question is whether the comma after the reference to interest indicates that the interest allowance is *not* governed by the contract. See 3 *Collier on Bankruptcy,* 15th Ed., § 506.05, pp. 506–41,42 (1985), regarding the alleged "misplaced comma" and the resultant ambiguity.

There is very little legislative history on this provision but Judge Clark makes a convincing argument that the punctuation does not indicate a Congressional intent to render the contract rate irrelevant. See *In re Loveridge Machine & Tool Co.,* 36 B.R. 159 (Utah 1983). He also pretty well demolishes the analysis of two Chapter 13 cases to the contrary which are relied upon by the debtor in the present case.

It should be noted that the *Loveridge* ruling itself is not directly applicable here since it does *not* involve a "default rate" issue. The basic contract rate in *Loveridge* happened to be 19 percent and that rate was held applicable. No question of any *increased* interest rate was presented in that case.

On balance, I conclude that § 506(b) should be construed to include reference to interest at the contract rate. This, however, does not settle the issue as to default rates since—as will be developed below— the Supreme Court has held that contractual and other legally-established rights may sometimes conflict with equitable principles of distribution under the bankruptcy laws.

## SUPREME COURT CASES

The Supreme Court affirmed the denial of a *contractually-provided* right to payment of interest-on-interest to first mortgage bondholders in a reorganization proceeding in the case of *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). The court in that case noted that payment of such interest, aggregating some $500,-000, would result in "subordinate creditors [receiving] a greatly reduced share in the reorganized corporation" and that even if such interest was valid under state law

"we would still have to decide whether allowance of the claim would be compatible with the policy of the Bankruptcy Act." [329 U.S. at pp. 159 and 162, 67 S.Ct. at pp. 238 and 240].

The collateral property in *Vanston* was clearly sufficient in value to pay the entire secured obligation—including the interest on interest. The Court nevertheless denied payment of the latter item. The Court first noted generally:

When and under what circumstances federal courts will allow interest on claims against debtors' estates being administered by them has long been decided by federal law. Cf. *Board of Com'rs of Jackson County v. United States,* 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; *Royal Indemnity Co. v. United States,* 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361. The general rule in bankruptcy and in equity receivership has been that interest on the debtors' obligations ceases to accrue at the beginning of proceedings. Exaction of interest, where the power of a debtor to pay even his contractual obligations is suspended by law, has been prohibited because it was considered in the nature of a penalty imposed because of delay in prompt payment—a delay necessitate by law if the courts are properly to preserve and protect the estate for the benefit of all interests involved.

\* \* \* \* \* \*

Simple interest on secured claims accruing after the petition was filed was denied unless the security was worth more than the sum of principal and interest due. *Sexton v. Dreyfus,* 219 U.S. 339, 346, 31 S.Ct. 256, 258, 55 L.Ed. 244. To allow a secured creditor interest where his security was worth less than the value of his debt was thought to be inequitable to unsecured creditors.

\* \* \* \* \* \*

But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the

secured creditor rather than to the debtor. *Coder v. Arts,* 213 U.S. 223, 245, 29 S.Ct. 436, 445, 53 L.Ed. 772, 16 Ann.Cas. 1008; *Sexton v. Dreyfus,* supra. See also *Johnson v. Norris,* 5 Cir., 190 F. 459. [329 U.S. at 163–64, 67 S.Ct. at 241]

The Supreme Court in *Vanston* then considers the particular situation before it:

It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor. See *Sexton v. Dreyfus,* supra, 219 U.S. at page 346, 31 S.Ct. at page 258, 55 L.Ed. 244.

\* \* \* \* \* \*

In this case where by order of the court interest was left unpaid, we do not think that imposition of interest on that unpaid interest can be justified by "an application of equitable principles." See *Dayton v. Standard,* 241 U.S. 588, 590, 36 S.Ct. 695, 696, 60 L.Ed. 1190.

\* \* \* \* \* \* .

The extra interest covenant may be deemed added compensation for the creditor or, what is more likely, something like a penalty to induce prompt payment of simple interest. In either event, first mortgage bondholders would have been enriched and subordinate creditors would have suffered a corresponding loss, because of a failure to pay when payment had been prohibited by a court order entered for the joint benefit of debtor, creditors, and the public. Such a result is not consistent with equitable principles. For legal suspension of an obligation to pay is an adequate reason why no added compensation or penalty should be enforced for failure to pay. [329 U.S. at 165–67, 67 S.Ct. at 241–43]

In the present case it should be noted that Judge Thinnes refused to permit the debtor make monthly payments to Metropolitan Life Insurance Company of $30,000.00, finding that Metropolitan Life Insurance Company had adequate protection by an equity cushion, and instead directed the debtor to make those payments to the junior lienholder. See *In re Sheppley & Co.,* supra, and the record herein.

The Supreme Court has also ruled in *American Surety Co. v. Sampsell,* 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663 (1946), that contractual *and* statutory rights under state law would not be applied literally when to do so would produce an inequitable result in a bankruptcy proceeding. In that case a surety had paid, pursuant to a bond issued to the debtor, all mechanic lien claimants who had filed their notices of lien within the time specified. The surety then filed a claim in the bankruptcy case. Three mechanic lien claimants who had *not* filed notices also filed claims.

The Court in *American Surety* affirmed a subordination of the surety's claim, under equitable principles, to the claims of the late lien claimants even though the claims of the latter were unenforceable under the bond and a state statute. The Court commented:

We recently had occasion to reiterate that federal bankruptcy law, not state law, governs the distribution of a bankrupt's assets to his creditors. *Prudence Realization Corp. v. Geist,* 316 U.S. 89, 95, 62 S.Ct. 978, 982, 86 L.Ed. 1293. See also *Pepper v. Litton,* 308 U.S. 295, 303–306, 60 S.Ct. 238, 243–245, 84 L.Ed. 238; *Prudence Realization Corp. v. Ferris,* 323 U.S. 650, 653, 65 S.Ct. 539, 540, 89 L.Ed. 528. True, we stated in both Prudence opinions that the federal law governing distribution of a bankrupt's estate should be applied with "appropriate regard for rights acquired under rules of state law ..." But the extent to which state law is to be so considered is in the last analysis a matter of federal law. [327 U.S. at 272, 67 S.Ct. at 244]

## OTHER CASES

Surprisingly, there does not appear to be any square holdings under § 506(b) dealing specifically with the question of a contractual default rate of interest. The only case Metropolitan could cite to the court, when pressed in oral argument, that actually has

enforced a default rate in the pre-confirmation stage of a Chapter 11 proceeding was *In re Berry Estates, Inc.*, 34 B.R. 612 (S.D.N.Y.1983). The facts as stated in *Berry Estates* are somewhat unclear and the court makes no mention of § 506(b). There is also no discussion of the question raised by *Vanston* and succeeding cases. The court in *Berry Estates* ends by noting that its case was two years old, with no plan filed, and that the default rate the court imposed (in the absence of a specific contractual percentage) was "a fair and equitable rate in the circumstances of this case."

Two cases in the Eighth Circuit do indicate, by analogy, that a bankruptcy court may not be bound to apply a default rate in a reorganization proceeding in certain circumstances. In *U.S. Trust Co., v. Zelle*, 191 F.2d 822 (8th Cir.1951), the court of appeals in a railroad reorganization case applied the *Vanston* doctrine to deny interest at a rate exceeding the rate specified in secured bonds, even though a state statute provided for a higher rate after default, and even though the collateral was ample to pay the additional interest.

The court in *Zelle* considered in detail the rationale of the *Vanston* decision:

> Appellants argue that in the Vanston case the Supreme Court only condemned the allowance of interest on interest and that principles of equity do not require and the facts of this case do not authorize the court to disregard the six percent simple interest rate fixed by the New York statute. As we read and interpret the majority opinion in the Vanston case, it goes further than to merely hold that provisions of a state law authorizing interest on interest may be disregarded by a Bankruptcy Court if principles of equity in the administration of that Act prompt so doing. It definitely establishes the rule of law that any state statute which is not consistent with principles of equity in the management and distribution of a bankrupt estate under the Bankruptcy Act may be disregarded by the Bankruptcy Court.

> \*     \*     \*     \*     \*     \*

> The majority opinion in Vanston v. Green, supra, makes it clear that the right to allowance of interest during bankruptcy does not necessarily spring from an authorization therefor by state law, but arises from equitable considerations resulting from the preferential position of secured creditors to general creditors.

> \*     \*     \*     \*     \*     \*

> The responsibility resting upon the trial court to weigh the equities and determine whether the rate of interest provided by the law of New York should be applied or whether equitable principles under the Bankruptcy Act required the fixing of a different rate, the sole remaining question of importance is whether the trial court properly discharged that responsibility. [191 F.2d at 824–25]

The court of appeals in the *Zelle* case then concluded:

> Can it be said with reason, logic and fairness that because the court prevented the payment of these bonds on maturity the debtor's estate shall be in a sense penalized by increasing the rate of interest theretofore paid two percent per annum, amounting to an increase in interest charges of approximately $250,000 a year, to the financial detriment and disadvantage of other creditors? We have no hesitancy in reaching the conclusion that broad principles of equity forbid such a course of action. To increase the distribution to these bondholders over and above the amount they had been receiving in interest, because the court in the orderly administration of the debtor's estate for the purpose of bringing about a ratable distribution of the assets of that estate among all the creditors has prevented the payment of the bonds at maturity, would in our judgment be inequitable and unjust to the other creditors. And we conclude that the circumstances amply justified the conclusion of the trial court that in the absence of a definite

provision in the bonds fixing the rate of interest after maturity, the preferred status of these secured bondholders entitled them on equitable principles to interest during the remaining period of bankruptcy at four percent, the rate which by agreement under the mortgage obligation had been paid for half a century, and which rate under present economic conditions is an appropriate rate of interest. [191 F.2d at 825–26]

In the later case of *In re Black Ranches, Inc.*, 362 F.2d 8 (8th Cir.1966), the Eighth Circuit apparently affirmed an allowance of contractual default rates in a Chapter X reorganization proceeding.[3] Without citing the *Zelle* case, the court makes reference to state law on the issue, although still indicating it might not always be binding, but concluded the higher rate was appropriate in its case.

It should be noted that the *Black Ranches* case involved a Chapter X filed in 1954, in which no plan had yet been filed by 1966. [362 F.2d at fn. 1] The court of appeals concluded its decision by commenting:

> We recognize, of course, that there may be situations where the higher rate would produce an inequitable or unconscionable result, so as to require disallowance thereof. But we are not constrained *on this record* to upset Judge Delehant's conclusion that the increased stipulated rates are entitled to recognition. [Erroneous "not" before "entitled" deleted per footnote 3 above.] [362 F.2d at 16] [Emphasis supplied]

The Second Circuit reversed a reorganization court's refusal to allow default rate interest in *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir.1959), but did so on the express basis that it was dealing with a solvent debtor in which the benefit of the lower interest rate would flow to shareholders rather than to creditors.

The court in *Ruskin* distinguished the *Vanston* ruling in the following manner:

> Even if we agreed with the court below that a Supreme Court precedent dealing with an obligation for interest on interest falling due because of an equity court's stay order is equally applicable to a claim based upon a contractual provision for additional simple interest arising because the debtor sought the intervention of the bankruptcy laws, a question we need not now decide, we would still have to distinguish *Vanston* on what we find was a basic ground of that decision. In *Vanston* the debtor was insolvent, and in our case it appears the debtor is solvent. In *Empire Trust Co. v. Equitable Office Bldg. Corp.*, 2 Cir., 1948, 167 F.2d 346, we avoided a resolution of the effect of Vanston upon parties to a reorganization proceeding involving a solvent corporation, but the issue is squarely before us now, and we hold that the Supreme Court did not intend that the principle enunciated by it in Vanston, in a contest between creditors, should be applied to a contest between a debtor's creditor and its stockholders. [269 F.2d at 830]

The court did note in conclusion in *Ruskin* that "there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings." Again, a flexibility on the issue is indicated. Cf. also *In re Atlanta International Raceway, Inc.*, 513 F.2d 546 (5th Cir.1975).

Finally, it appears that the Eighth Circuit in particular is amenable to a flexible approach when dealing with rights of secured creditors which impact upon bankruptcy reorganization proceedings. In addition to the *Zelle* and *Black Ranches* cases cited above, the Eighth Circuit has recently refused to follow the Ninth Circuit's ruling that "lost opportunity costs" are a required element in determining adequate protection for a secured creditor during a reorganization proceeding. *In re Briggs Transporta-*

---

**3.** The court at Headnote 9 of its opinion (West Publishing report) uses the words "not entitled" in describing the district judge's finding, but the entire opinion indicates the district judge *did* allow the higher rate and his decision was affirmed. The West headnote picks up this apparent error.

*tion Co.,* 780 F.2d 1339 (8th Cir., 1985). While the court of appeals was there dealing with the separate issue of adequate protection of a secured creditor under § 361 of the Bankruptcy Code, the court noted that "creditors have no right to be placed in the same economic position as if there had been no bankruptcy filing" and quoted legislative history in which Congress recognized that "[t]here may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimented to the policy of the bankruptcy laws." [780 F.2d at 1346–47.] The court of appeals opted for a more flexible "balancing act" approach instead, and left considerable discretion to the bankruptcy court in weighing the particular factual and procedural situation involved. [780 F.2d at 1347–50]

## CONCLUSION

■ In the absence of any square ruling to the contrary, I conclude that a bankruptcy court presented with a § 506(b) motion is not *required* in all cases to apply a contractual default rate of interest in determining the amount of an "allowed secured claim" within the meaning of that section. It should be emphasized that all that is being determined here is the *pre-confirmation* amount of the claim. Questions as to whether the plan treatment of the secured creditor is "fair and equitable" and whether it is receiving the "indubitable equivalent" of its claim—should the secured creditor object to the plan—are issues left under § 1129 of the Code for the confirmation hearing.

While I recognize that the cases cited can be read in different ways as to what they may "imply" as to the question squarely presented to this court, I do believe they all indicate that flexibility is possible in determining whether default rate of interest should be allowed in a particular reorganization proceeding. The rationale of the *Vanston* case, in terms of balancing the equities, still applies under the present nonspecific provisions of § 506(b) of the current Bankruptcy Code.[4]

■ Also, whether a default rate is or is not a "penalty" unenforceable under state law is not controlling, in my opinion, in view of the Supreme Court's holdings in the *Vanston* and *American Surety* cases, and in view of the *Vanston* rationale that the "law's delay" should not inequitably penalize junior creditors. While a default rate may well not constitute a penalty, as between the secured creditor and the debtor, under state law and for state law purposes, that conclusion does not answer the *federal* question of relative distributive rights of creditors in a reorganization proceeding. As the Supreme Court stated in the *American Surety* opinion quoted above "appropriate regard" should be given to the state law but the distribution in bankruptcy "is in the last analysis a matter of federal law."

■ Reviewing the record in the present case I find the following pertinent factors pointing to the inappropriateness of allowing a default rate of interest on the Metropolitan's secured claim: (1) Metropolitan has never faced any realistic risk of nonpayment of its debt either before or during these proceedings; (2) There is no evidence before the court that the 9.27 percent basic contract rate was not a prevailing market rate of interest at the time of default and thereafter; (3) Justification for an increased rate to compensate for an assumed increased risk following default does not apply in this case, particularly since the plan proposal is for a relatively quick orderly liquidation as opposed to a long-term "internal operation" type of reorganization; (4) On the evidence presently before the court it does not appear likely that distribution under the plan will reach down to shareholder interests; and at confirmation

4. While I have concluded that Congress "probably" intended a reference to contract interest rates in § 506(b), I likewise conclude that Congress did not specifically intend to *mandate* default rates contrary to the flexible approach adopted in *Vanston* and its succeeding line of cases.

of any plan, if it should appear that shareholders may benefit, the court in its confirming order can provide for recapture of the default rate interest for Metropolitan if the *Ruskin* ruling is determined to be persuasive and to be followed in this Circuit; and (5) There is some indication in this record that the delay from September of 1984 to date in reaching a plan hearing has been due in part to unnecessarily obstructive tactics by Metropolitan in opposing just about every motion put forward by the debtor, as for instance a motion to appoint a broker to seek interested investors, even though Metropolitan has been fully protected on its lien from the start and could not be harmed by the relief requested.

The foregoing shall constitute findings of fact and conclusions of law in accordance with the Bankruptcy Rules. A separate order shall issue determining the amount of the pre-confirmation allowed secured claim of Metropolitan Life Insurance Company in accordance with the 9.27 percent basic contract rate of interest.

### ORDER DETERMINING ALLOWED SECURED CLAIM OF METROPOLITAN LIFE INSURANCE COMPANY

This case was heard on February 28, 1986 and May 19, 1986 upon the "Application for Determination of Secured Claim of Metropolitan Life Insurance Company Pursuant to 11 U.S.C. § 506" filed herein by Metropolitan on February 11, 1986.

The court having heard oral argument of the parties, having reviewed the stipulated facts, and having reviewed the record in this case and briefs submitted by the parties; and the court having set forth separately its findings and conclusions in its Memorandum Opinion entered this date; it is accordingly

ORDERED ADJUDGED and DECREED as follows:

1. Metropolitan Life Insurance Company is hereby determined to have an allowed secured claim, within the meaning of § 506(b) of the Bankruptcy Code, in the total amount of $4,057,658.74 as of May 1, 1986, together with accruing per diem in-

terest in the amount of $796.67 daily from that date until the date of confirmation of plan of reorganization in this case.

2. The foregoing determination is subject to the proviso with regard to the plan confirming order set forth at the end of the aforesaid Memorandum Opinion entered this date.

DONE and ORDERED this 30th day of May, 1986 at Manchester, New Hampshire.